Please be seated, ladies and gentlemen. We have five cases in the calendar this morning. Three patent cases, two from district courts and one from the patent office. And two government employee cases, one of which is being submitted on the briefs and will not be argued. First case is OPTi Inc. v. VIA Technologies, 2013-1670, 2014-1839. Mr. Carpenter, good morning. Please proceed. May it please the court. I'm Brian Carpenter, and along with my co-counsel, Tim Craddick, represent VIA Technologies, the appellants and cross-appellees. VIA requests that this court reverse and render judgment of non-infringement for two reasons. First, the determining function is not met because the accused VIA chipsets cannot determine whether data is cached in a modified state in the L1 cache. Second, OPTi failed to lay a legally sufficient record upon which any reasonable juror could find that structures in the accused VIA chipsets were equivalent to the corresponding structures for the two means plus function limitations. Alternatively, if in the event that this court finds that it cannot enter judgment, VIA at least requests a new trial due to the erroneous jury instruction on the 112-6 equivalence issue. VIA also requests the judgment that the sequentially transferring means is indefinite. Since indefiniteness is clear, there's no reason to reach enablement, but as briefed, claim 26 is also invalid for lack of enablement as explained in the briefs. Regarding the determining function, there is no dispute about the one crucial fact that was admitted by Dr. Smith and confirmed by VIA's expert. And that is, the accused VIA chipsets cannot tell whether modified data is cached in the L1 cache or the L2 cache. As stated by Dr. Smith, OPTi's expert, the accused VIA chipsets simply do not know which one or both have modified data. What is the point here? If I understand correctly, at the time, the cache memory could be a readback memory or a readthrough memory. And the patent is dealing with cache memory, which is readback memory. Is my understanding of that correct? I believe in one small aspect you're mistaken, Your Honor, and that is that it dealt with writeback cache, not writethrough cache. The invention dealt with writeback cache. I said readback. I should have said writeback. So the reason it's not concerned with the L2 cache at the time was that that was part of a secondary memory, right? That is correct. Figure 1 of the patent shows it was part of the secondary memory. So if I understand the accused infringing product correctly, both the L1 and the L2 are writeback cache memories, right? To put it, yes, but to put it a little differently, in the modern devices, writeback is done with respect to all caches, no matter how many there are. Right. So in terms of looking at it as a doctrinal equivalence issue, wouldn't you want this to apply to all writeback caches and not just the L1? Well, first of all, a doctrine of equivalence was not argued on this function. There's no alleged equivalent function to the one that's claimed. I'm not sure I understood your question. Well, the identification in this claim of the first cache memory is designed to distinguish it from other cache memories, which are part of the secondary memory, correct? So we have a problem of trying to figure out what this claim means where you have cache memories where more than one of them is a writeback memory. Is that fair or unfair? I believe that's a little unfair because at the time of this invention, there were CPUs that had an L1 on board, but it was a writethrough cache. And then the L2 would be in the secondary memory, and it would be writeback. Indeed, we had a piece of prior art. In fact, we had a very, very early circuit board that operated that way. That is why we have pushed for a construction of said first cache memory as the first memory, the first cache memory that was a writeback cache. And Oppy resisted that and pushed for it. But it didn't contemplate at the time of that. It didn't contemplate that the other cache memories would also be writeback cache memories. Oh, to the contrary. There's a whole paragraph in the patent that talks about other levels of cache. But the time frame of this patent, in early 1994, Intel had announced the Pinion processor, the 486 processor. Help me because I'm not understanding here. At the time of the patent, they focused on the L1 cache because, if I understand correctly, that was the only cache memory that was a writeback memory. Other cache memories were writethrough memories. No, no. Excuse me, Honor. I don't believe that's correct. The decision or the difference in various designs was whether or not L1 would be writethrough or writeback. As to all the others, writeback was a well-known established technique. So I think it's the reverse of the way Your Honor is thinking of it. Well, I thought you said the L2 was a writethrough memory. No, Your Honor. I didn't. If I said that, I was mistaken. The L2 was always writeback. The piece of prior art VIA would have used, had it obtained the construction it pushed for, was a design where the L2 was writeback, the L1 was writethrough. And because of the construction Opti pushed for, we had to rely only on the designs where… But I guess what I'm trying to say, and I don't want to use up all your time with this, is that the Claim 26 is concerned with writeback memory, which is where the problem arises. And why shouldn't, I guess what I'm saying, why shouldn't Claim 26 be construed to cover all writeback memories, whether they're the first memory or the second memory? Well, because, Your Honor, it was not construed that way. And if it is to be construed that way, I would contend we should have another shot at anticipation of a new trial, because it was not construed that way. The way it was construed and its construction Opti pushed for was a particular cache. And if I may make one more point, as you've noted, Figure 1 of the patent shows L2 as part of secondary memory. And there's, even in the claim itself, the preamble distinguished between secondary memory and a first cache memory. They're two different items in the preamble. So that's one more reason we believe that the L2 is completely separate from first cache memory. Do you want to move on to your other points? Yes, Your Honor. Turning to the means elements, at trial, Opti grossly oversimplified the infringement analysis at the expense of developing a legally viable record that any reasonable juror could find infringement on. As demonstrated in VIA's briefing for each of the means plus function elements, Dr. Smith oversimplified the functions and identified an oversimplified way and result. He then took the oversimplified function way result and looked for each of these in the accused devices. There is no precedent, nor has Opti cited and demonstrated that the way and the result could be used like claim limitations that you look for in the accused devices. The way result analysis requires identification and discussion of structural differences. In its response to VIA's second stated issue, that VIA's entitled to judgment as a matter of law, Opti continued to argue about jury instructions. It is true that VIA led its opening brief discussing jury instructions, but it did so because that facilitated an early discussion in the briefing about the law on insubstantial differences. It also highlighted an important difference between the parties' understanding of the law. VIA has demonstrated by its review and discussion of this court's precedence that the test for section 112 equivalence is insubstantial differences. Under this correct statement of law, the court's de novo review is made much easier as Opti's expert did not present any testimony regarding differences or insubstantial differences. But as to VIA's primary position that judgment should be entered as a matter of law, the jury instructions are irrelevant. The issue is that infringement should have never been allowed to go to the jury. Under either statement of the law, reflected in the two jury instructions, Opti failed to conduct a proper way result analysis. Opti claims that VIA is trying to graft a new requirement, identification of differences in the test, and that that's unsupported or to the contrary. VIA's extensive analysis of the opinions of this court that a proper way and result analysis begins with an identification of differences between two sets of structures. The cases relied upon by Opti demonstrate that analysis of differences is required. For example, Opti relied on Odetics as does VIA. The court in Odetics noted that this court in Cheminada, after construing the claim, identifying the structures, proceeded to analyze the differences between skid plate, the corresponding structure, and the assertively equivalent structure in the accused device, a set of soft rubber wheels. To analyze differences, one must first identify the differences. The cases of Cheminada, Alpex, Solomon discussed at length in VIA's briefing provide additional good examples of a proper way result analysis. All these cases demonstrate that structural differences must be identified. Opti accuses VIA of insisting on component by component analysis as shown in VIA's discussion of Odetics, Caterpillar, Toro, and Solomon. The phrase component by component refers to the impermissible practice of further subdividing the corresponding structures into additional parts, contrary to what Opti would have this court believe. VIA did not insist on one-to-one correspondence, nor did it subdivide the corresponding structures. Dr. Smith simply failed to acknowledge any differences, much less make a comparison as between corresponding and accused structures. Requiring Opti to account for the corresponding structures and equivalents thereof is necessary to prevent purely functional claiming. In Valmont, this court explained that Congress in the 1952 Patent Act added 112.6 to, in effect, overrule the Supreme Court's decision in Halliburton 329 U.S. 1 at 9. The Supreme Court had prohibited means plus function language, fearing it would be overbroad and ambiguous. Congress decided to permit broad means plus function language, but added a standard. That standard is the second clause of paragraph 6. Mr. Carpenter, you're into your rebuttal time. You can continue or save it as you wish. Let me finish this one quick point, and then I'll reserve the rest. The point of the second clause of section 112.6 is to avoid purely functional claiming. It's stated in Aristocrat 521F3 at 1328. Allowing Opti and Dr. Smith to ignore the structures in the court's construction would be to allow purely functional claiming. That is, a black box for performing a function. In Alpax, this court granted judgment where the expert concluded a purely functional and not structural analysis. We request that this court do the same and enter judgment of non-imprisonment. I'll reserve the rest. We'll save the remainder of your time. Mr. Brody. Thank you, Your Honor. My name is Michael Brody. I'm here today with Jeff Eaton on behalf of Opti, Inc. Mr. Michael Mazzoni of Opti is present today as well. I thought I'd try to be very quick with respect to the issues that Mr. Carpenter addressed. I have some concern about this first cache memory point. I'm not at all sure that the district court was right in saying that it doesn't make any difference that the infringing device retrieves the L1 attitude cache memories. And I was trying to understand what was going on at the time with the patent issue. If I understand correctly from the patent, the L1 memory was a write-back memory, but the L2 memory at that time was part of the secondary memory. So the thing would only operate on the L1, but now the accused infringing device has more than one write-back memory. So you would want the patent to operate on both of those memories. Does that make sense to you? That was my understanding. I mean, I think there's another way of dealing with that issue, which is simply that in the VIA chip, the VIA systems, let me back up. What the claim requires is determining whether the L1 has data cache in a modified state. And nobody disputes that the VIA systems determine that, because they have to. If they didn't, the system would crash, or you'd get even worse. It wouldn't crash, but you'd get faulty data being used for the various applications. So it operates on both the L1 and the L2, right? Yes, sir. And that's the way it determines if L1 is in a modified state. Well, it doesn't tell you whether it's L1 or L2, right? No, but the inverse, I think it is, is true. So if the L1 is in a modified state, that is determined by the chip set. Yeah, but I'm not sure that the district court was correct in saying it doesn't make any difference that it's also operating on the L2 as well as the L1. Well, I appreciate that. And I think our position would be, first of all, the distinction that Your Honor was drawing when Mr. Carpenter was up is an appropriate one. Second, the difference between operating on the one or the other is in itself an insubstantial difference. Was the doctrine of equivalence argued with respect to this aspect of the claim? No, it wasn't. But third, what the claim calls for is determining whether the L1 is cached in a modified state. And that is what the chip set does. The way the VIA chip set is designed, that can be accomplished by basically checking both of them or the L2 cache. It doesn't matter. But the fact that the VIA chip set does more than what the claim has required doesn't mean that it fails to do what the claim is requiring. And that, I think, is the position that was basically argued below. And I think that's the simplest answer to this whole question. We're doing exactly what the patent... Or they're doing exactly what the patent... I'm not sure that the simple answer is right. Well, one can only hope. I'm looking for another answer. I guess I'm not understanding why the simple answer is unsatisfactory. So the claim is calling for a particular determination to be made. And the nature of that requirement... It wouldn't make any sense that in modern times where all the cached memories are write-back memories, that it wouldn't operate on all the write-back memories. But I guess I'm struggling how to put that into the claim language. Because what the claim language requires is a determination as to the status of the L1 memory. And the reason it requires that is because if there's any modification, then you have all the problems that the patent is addressed to. There's no dispute, as I understand it, that if an L1 memory is in a modified state... Are you saying basically that the accused ships check both caches? We can't tell which one it's checking, but it has to check the L1 in the course of its operation. And by doing that, it infringes your patent. I think that's right. To be honest, Your Honor, I'm having a little bit of a brain cramp, and I can't remember whether it checks both or whether the L2 has a copy of the L1. But whatever it's doing, it can't not determine what the status of the L1 is. That is just a prerequisite to the machine continuing to operate. And that's what the claim language requires. The point of the determining language, at least based upon the agreed claim construction, is just determining whether there's anything in the cache in a modified state. Exactly. And if there is anything in the cache in a modified state, that is discovered in the VIA chipset. Because it can't not be discovered. If it were in a modified state and that were overlooked somehow, then the system wouldn't work the way it's designed to work. I guess there's an argument here, and I think you make it, that if they wanted to make this point, they should have made it as a claim construction argument, which wasn't made as a claim construction argument. I think that's right. The claim construction dispute was Optia proposed that L1 was the first level of cache memory, commonly known as L1. And VIA proposed that it was the first level of cache memory that uses a write-back protocol. The rejection of theirs in favor of ours, I think, was simply being true to the patent. But again, I think that if they had wanted to claim, argue that infringement was only possible by a particular technique of determining what's in the L1 cache. It was operating only on the L1. I'm sorry? Operating only on the L1. Yes. That could have been argued, but that wasn't. And I don't think the patent would have supported that. I mean, I think the patent is about cache consistency or cache coherency. And that was an issue for L1 caches. And it's an issue that's addressed by the VIA chipset, and that's why we think they infringed that limitation. On the equivalency points, I think our basic position is in the brief, so I'll be very short on it. Even if you accept everything that Mr. Carpenter said, the reality is that our expert, the structures that were identified for each of the means were for the sequentially transferring means, the system controller and peripheral controller, and for the determining means, the same two structures, and in particular the logic that was shown in them for generating two signals that accomplished the snooping operation. Dr. Smith discussed each of those structures, explained how the patent characterized their function, their method of operation, and the result they achieved, and compared that directly to VIA chipsets relying extensively on their documentation and on testing. It was a classic means plus function analysis, classic function weight result analysis. We'd respectfully submit that the jury's determination on that was fine. They say that your expert didn't address the structural equivalence. That's simply not true. Can you show us where you did address the structural equivalence? There's a—it's basically the record passages that are discussed at pages 34 through 40 of our brief, 41 of it. Which page? Which page? So with respect to the means for determining, it's at A1259, line 24 through 1262—I'm sorry, through 1268, line 8. 1259? 1259, 24—1259 through 1268. 1268. Well, okay, but where in particular? So he discussed the function. This was all done with respect to— Where does he discuss the structural equivalence? The structural equivalence is in that passage, Your Honor. That's where he's talking— Where? What page? What line? I want to read it. I don't have the transcript in front of me. I can't read you the line. The structural equivalence— What is the structural equivalence? The structures in the patent are the chipsets. The structures in the VIA product are their north bridge and south bridge. Wait, I don't care about the VIA product. So you say in the patent the structures are the chipsets. How are those chipsets defined in the patent? The chipsets are referred to as the—the north bridge is the system controller, and the south bridge is the IPC, which is the integrated peripherals controller. Those refer to a particular chipset that was in the market. They're commercial chipsets— It was a commercial chipset. That operated in a particular way. Yes, sir. And there are figures in the patent that lay out the logic circuitry that implements the functionality. There are figures in the patent that show the operation, the behavior of the chipset in very specific terms. What Dr. Smith did was he compared that functionality and that structure, which in this case is essentially the logic that— Yeah, but the problem is he can't point us where. You're supposed to come to the oral argument. My colleague points me to page 170—I'm sorry, A1260. Do Viya products have a chipset, or are they chipsets? Yes, and you just put up the data sheets for the CN700 north bridge, the VT8237R plus south bridge. Now, I'm going to focus most of these questions on these two particular products, and then later on I'll ask you to explain how the technology you've seen these products relate to other products that are also at issue. Do the Viya chipsets, do they operate in the same technological context as the claim requires? And he explains yes, and then he goes through in the following pages and points to the particular logic blocks in each of those chipsets, the signals that they generate, and compares those to the correlate disclosures in the patent. Where does he say the structure is equivalent? I guess what I'd say, Your Honor, is that what I just read to you is a statement that the structure is equivalent. He's saying these are the structures that I'm comparing, and here is how they are equivalent. And then he—I mean, it's lengthy testimony. He says it's the same technological context. That's not the same thing. The same, they're equivalent. Well, for example, on page 1262, so let's just focus on these two, and then we'll get to the signals coming out of the North Bridge. I'll ask you whether those are also—I'm sorry, that's the wrong passage. Mr. Burden, we have to move on. Yes, sir, I understand. I'm using up my rebuttal time, but I don't think it's in a worthy— You're going to your rebuttal time, which—well, you don't have rebuttal time except for the prosecutor. Right, I understand. And that's only if it's raised by Mr. Carpenter, and we'll save your final half minute if you like. I'd rather spend it by giving Judge Dyke a reference if I can. I guess the best answer I can give you, sir, is that I thought what we had done in the brief, and the reason I'm having trouble—there's not like a neat punchline. The reason I'm having trouble is because he did go through specific structures and say, do they function the same way? And he gave that evidence. Do they perform the same function? Do they do it in the same way, and do they achieve the same result? And he did it with reference to particular structures in each instance. It's not—I can't give you a place where it's wrapped up in a bow, but I thought we had in the briefing given you the passages where each of those steps was performed, and that's why I'm having trouble just giving you a punchline like that. And I apologize if that means I'm unprepared, but I do believe that we addressed it very specifically in the briefs and that he gave exactly that testimony. So I appreciate your time and your questions. I think I'm through. Picking up on the point that was just left off on, we went—VIA went to great lengths in its reply brief to set out and fairly present Mr. Spitz's testimony. I think you'll see there that there was no side-by-side comparison of differences. If you look at this Court's opinions in Cheminada and the Cross opinion, 424F3, 315, this Court has spent columns discussing relatively simple structures, comparing the differences, talking about the differences. When you get to a more complex structure, like in the Solomon case that came out of the ITC, there's pages of discussions about the differences of these highly complex systems. In this case, that record doesn't exist. OPTI failed to present the record. Another reason VIA discussed a new trial was we needed to walk through Mr. McAlexander's testimonies to show this Court how it should have been done. Mr. McAlexander's testimonies presented in VIA's opening brief clearly presented a compare and contrast of differences, discussed differences. And the figure at A2012 shows his conclusions and where he used certain differences between the two sets of structures as mileposts or guideposts to determine insubstantial differences and ultimately— they're not insubstantial differences. In the last 30 seconds, there's a lot we could say about L1, L2, but the reality is technology has far progressed beyond where the patent was. In the patent at the top of, I believe it's column 20, talks about snooping L2 as yet a separate step. In modern architectures, the duffers are so deep that there is no need to snoop each cache. All the North Bridge cares about is there modified data somewhere. If so, it writes back everything, flushes the buffers, and still keeps up with PCI transfer. Thank you, Your Honors. Can I have one other question? Did you argue on J-Mall that they didn't produce any evidence of filament structure? Yes, Your Honor, that is our position. No, it is now, but did you argue that? Oh, yes, Your Honor. We started with Daubert trying to— they were not doing a legally sufficient analysis. We moved again at the conclusion of the plaintiff's case in chief. We moved again at the end of the defendant's case in chief, and we moved post-trial. So at every step of the way, we were telling the court, this is not—he should not be allowed to use these oversimplified functions and weigh and resolve these proxies for claim limitations. He must do a differences analysis. That was always our argument. Thank you, Mr. Coffin. Your Honor, there was nothing on the cross-appeal, and so we'll conclude the argument. Take the case on review. Thank you, Your Honor.